EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Municipio de San Juan<br>    Demandante<br><br>               v.<br><br> Bosque Real S.E.; MAC Development<br> Corp.; Junta de Planificación;<br> Junta de Calidad Ambiental<br>    Demandadas–Apeladas todas<br>    Peticionarias las dos primeras<br><br> Fundación Luis Muñoz Marín<br>    Interventora–Apelante<br>    Recurrida | Certiorari<br><br>2003 TSPR 31<br><br>158 DPR \_\_\_\_ |

Número del Caso: CC–2000–361

Fecha: 4 de marzo de 2003

Tribunal de Circuito de Apelaciones:
                    Circuito Regional I

Juez Ponente:
                    Hon. Rafael Ortiz Carrión

Abogados de la Parte Peticionaria:
                    Lcda. Alicia I. Lavergne Ramírez
                    Lcdo. Danilo M. Eboli


Abogados de la Parte Recurrida:
                    Lcda. Heidi L. Rodríguez
                    Lcdo. Jorge E. Pérez Díaz
                    Lcda. Glenda Labadie Jackson

Materia: Entredicho Provisional, Injunction Preliminar, Injunction
        Permanente, Mandamus y Sentencia Declaratoria

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Municipio de San Juan

    Demandante

      v.

Bosque Real S.E.; MAC Development          CC-2000-361
Corp.; Junta de Planificación;
Junta de Calidad Ambiental

    **Demandadas – Apeladas todas**
    **Peticionarias las dos primeras**

**Fundación Luis Muñoz Marín**

    **Interventora – Apelante**
    **Recurrida**

**Opinión del Tribunal emitida por la Jueza Asociada señora NAVEIRA DE RODÓN**


**San Juan, Puerto Rico a 4 de marzo de 2003**


    **Bosque Real S.E. (en adelante Bosque Real) y MAC Development Corp. (en adelante MAC), recurren ante nos de una sentencia emitida por el Tribunal de Circuito de Apelaciones. Dicho foro revocó una sentencia sumaria emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, mediante la cual desestimó una demanda incoada por la Fundación Luis Muñoz Marín (en adelante Fundación). El foro apelativo intermedio determinó que la Consulta de Ubicación Núm. 92-17-1072-JPU (en adelante consulta de ubicación) y los permisos otorgados por la Junta de Planificación (en adelante Junta) para el desarrollo del complejo residencial Bosque Real carecían de validez y devolvió el caso al Tribunal**

de Primera Instancia para que la Fundación tuviera la oportunidad de probar si el desarrollo del proyecto le ha ocasionado daños continuos y progresivos a su predio. Examinemos detenidamente los hechos relativos al recurso de epígrafe.

I

El 2 de octubre de 1992, el codemandado Peter Sinz presentó ante la Junta de Planificación una consulta de ubicación con el objetivo de desarrollar un complejo residencial, denominado Bosque Real. El mismo constaría de tres (3) edificios, con un total de 240 apartamentos, y ubicaría en un predio colindante con la Fundación. La finca objeto de la referida consulta estaba zonificada como R-1, por lo cual el señor Sinz solicitó una variación de acuerdo con la sección 81.00 del Reglamento de Zonificación de Puerto Rico, vigente a partir de 1989 (en adelante Reglamento de Zonificación de 1989). Cabe señalar que para la fecha en la cual se presentó la mencionada consulta de ubicación estaba vigente el Reglamento de Zonificación de Puerto Rico de 16 de septiembre de 1992 (en adelante Reglamento de Zonificación de 1992), por lo cual eran dichas normas las aplicables a la Consulta. El codemandado solicitó que el proyecto se considerara como un "desarrollo extenso" y que se le eximiera de cumplir con los requisitos de densidad poblacional aplicables a los distritos R-1 y con otros requisitos reglamentarios.

Dentro del procedimiento llevado a cabo para la consulta de ubicación, se presentó ante la Junta de Planificación un "Formulario ambiental para proyectos residenciales, comerciales y/o turístico-recreativos" (en adelante Formulario Ambiental). En éste se informó que dentro de un radio de 300 metros en o fuera de la finca donde ubicaría Bosque Real, no existía sistema ecológico natural alguno, con excepción de la quebrada Sabana Llana.[1] El Formulario Ambiental omitió mencionar la existencia de una colección arbórea en el predio de la Fundación.[2] La Junta, mediante carta de 26 de abril de 1993, le informó a la Junta de Calidad Ambiental que estaba dispuesta a autorizar la consulta de ubicación para la construcción de Bosque Real ya que alegadamente el proyecto no ocasionaría un impacto ambiental significativo. En una carta posterior, el Presidente de la Junta de Calidad Ambiental le informó a la Junta de Planificación que el Formulario Ambiental había

---

[1] El Formulario Ambiental se limitó a informar lo siguiente: "Flora: Árboles como el mangó, quenepa, y flamboyán entre otros. Se observó crecimiento de pangola y yerba de guinea. Fauna: Se observaron mamíferos pequeños como las ratas, aves entre ellas las reinitas, lagartijos y un sin número de insectos. No se observaron especies en peligro de extinción."

[2] De acuerdo a un inventario llevado a cabo por la Fundación antes que Bosque Real derribara los árboles ubicados en el predio de ésta, la institución contaba con una colección arbórea compuesta por: Palo de Goma, Areca, Caimito, Guaba, Palma Real, Coco, Casia Amarilla, Flamboyán, Algarrobo, Terocarpo, Madre de Cacao, Jagua, Almendra, Aceitillo, Ayúa, Reina de las Flores, Yagrumo, Teca, Palma MacArthur, Péndula, Maga, Bambú, Manzana Malaya, Anacaguita, Burro Prieto, Mango, Tulipán Africano, Quenepa, Panapén, Jaca, Havilla, Hang-Hang, Balsa, Camasey, María, Coralitos, Mariposa, Caoba de Honduras, Roble Blanco, Alcanfor y Ceiba.

sido aprobado y que este satisfacía el requisito de evaluación del impacto ambiental del proyecto.

El 17 de junio de 1993, la Junta de Planificación emitió una resolución en la cual aprobó la consulta de ubicación para el proyecto Bosque Real. La vigencia de dicha consulta fue extendida posteriormente por un (1) año adicional. La codemandada MAC presentó una solicitud de enmienda a la consulta de ubicación, fechada 12 de diciembre de 1994, para que se le permitiera alterar los planos del proyecto y se le autorizara a construir once (11) edificios, estilo "walk-up", con capacidad para 180 apartamentos, en lugar de los tres (3) edificios con capacidad para 240 apartamentos que habían sido autorizados originalmente. Para la consideración de la enmienda solicitada, la Junta no requirió una nueva evaluación del impacto ambiental que ocasionaría el proyecto, sino que fue utilizado el Formulario Ambiental presentado previamente. Sin trámites ulteriores, la Junta aprobó la enmienda solicitada el 22 de diciembre del mismo año.

La Administración de Reglamentos y Permisos (en adelante A.R.P.E.) aprobó el desarrollo preliminar del proyecto el 28 de diciembre de 1995. En su resolución, A.R.P.E. determinó que Bosque Real debía cumplir con los requisitos para la zonificación R-3.

Los codemandados señor Sinz y MAC otorgaron escritura de compraventa mediante la cual Bosque Real adquirió el predio donde se desarrollaría el proyecto. Posteriormente, en una carta fechada el 2 de abril de 1996, la Oficina Estatal de

Preservación Histórica le informó a la Junta de Planificación y a Bosque Real que el predio perteneciente a la Fundación era candidato para inscripción en el Registro Nacional de Lugares Históricos. Debido a lo anterior, la Oficina recomendó que se mantuviera una distancia mínima de diez (10) metros entre el predio de la Fundación y el complejo residencial para proteger la colección arbórea existente en dicho predio y establecer una zona de amortización entre ambas fincas. Así las cosas, el 3 de mayo de 1996, ARPE expidió el permiso de urbanización para el proyecto. A los pocos días de haberse expedido el mencionado permiso, Bosque Real llevó a cabo la limpieza y nivelación del terreno donde construiría el proyecto. Tal limpieza provocó la destrucción de parte de la vegetación que había en el predio.

Ante tales actos, el Municipio de San Juan (en adelante Municipio) presentó la Consulta de Ubicación y Adquisición Núm. 96-17-0656-JGUT a los fines de establecer un parque en el predio donde se había autorizado la construcción del complejo residencial. La Junta emitió una resolución, notificada el 10 de julio de 1996, en la cual aprobó la referida consulta. Bosque Real solicitó reconsideración. Debido a lo anterior, la Junta dejó la resolución en suspenso y ordenó la celebración de una vista administrativa.

Por su parte, la Fundación presentó dos (2) escritos, titulados "Moción de desestimación" y "Comparecencia de la Fundación Luis Muñoz Marín interventor y vecino colindante",

en el procedimiento referente a la consulta de ubicación presentada por el Municipio, en los cuales cuestionó la validez de la autorización de la consulta de ubicación presentada por Bosque Real. El 30 de septiembre de 1996, la Junta de Planificación emitió una resolución en la que declaró sin lugar la solicitud de reconsideración presentada por Bosque Real y confirmó su aprobación a la consulta presentada por el Municipio. La agencia condicionó su aprobación al cumplimiento por parte del Municipio con los requisitos para la expropiación del terreno. En la misma resolución, la Junta desestimó la solicitud de la Fundación por entender que carecía de autoridad para dejar sin efecto una determinación llevada a cabo por un funcionario debidamente autorizado.

El 18 de septiembre de 1996, el Municipio radicó una demanda y una moción de interdicto preliminar y permanente contra Bosque Real, Peter Sinz, MAC, A.R.P.E., la Junta de Planificación y la Junta de Calidad Ambiental. En su demanda el Municipio solicitó que se declarara la nulidad de la consulta de ubicación presentada por Bosque Real y de los permisos otorgados para el desarrollo del proyecto. Solicitó, además, la paralización inmediata de las obras de construcción.

La Fundación presentó una demanda de intervención el 23 de septiembre de 1996 en la cual alegó que la consulta de ubicación y los permisos otorgados para la construcción de Bosque Real fueron autorizados en contravención a los requisitos de notificación, vista pública y declaración de

impacto ambiental establecidos en la legislación y reglamentación aplicables. Basándose en lo anterior, alegó que éstos carecían de validez y finalidad. Además, solicitó que el tribunal dictara los remedios apropiados para reparar los daños continuos y progresivos que la construcción había ocasionado al sistema ecológico existente en su predio. El Tribunal de Primera Instancia declaró con lugar la solicitud de intervención radicada por la Fundación.

El 23 de septiembre de 1996, se celebró una vista para atender la solicitud de interdicto preliminar presentada por el Municipio. El 11 de octubre del mismo año, dicho foro emitió una resolución interlocutoria en la cual desestimó la referida solicitud. Luego de varios incidentes procesales, el Municipio desistió de su demanda con perjuicio, sin embargo, la Fundación continuó con el pleito. La Junta solicitó la desestimación de la demanda alegando que: (1) de acuerdo con la doctrina de incuria, la Fundación estaba impedida de solicitar remedios interdictales; (2) la demanda constituía un ataque colateral a una decisión final y firme de la Junta de Planificación; (3) la Fundación tenía disponible el recurso de revisión judicial y no lo utilizó, por lo cual estaba impedida de incoar una acción en los tribunales; y (4) la Junta de Planificación había cumplido con todos los requisitos establecidos en la Ley sobre Política Pública Ambiental del Estado Libre Asociado de Puerto Rico, 12 L.P.R.A. § 1121 *et seq*. La Fundación replicó aduciendo que a pesar de ser el predio colindante con Bosque Real, nunca fue notificada de los procedimientos

referentes a la consulta de ubicación y por ello la Junta no podía plantear las defensas de incuria y cosa juzgada. Solicitó que el tribunal emitiera una sentencia sumaria parcial en la cual declarara la nulidad y falta de finalidad de la consulta de ubicación y de los permisos otorgados para el desarrollo de Bosque Real y que ordenara la celebración de una vista evidenciaria para determinar las medidas reparadoras a los daños progresivos y continuos que había sufrido su predio.

El Tribunal de Primera Instancia dictó sentencia sumaria parcial el 8 de agosto de 1998 en la cual desestimó la demanda incoada por la Fundación. La parte demandante radicó un recurso apelativo ante el Tribunal de Circuito de Apelaciones. El referido foro dejó sin efecto la sentencia sumaria emitida por el Tribunal de Primera Instancia y devolvió el caso para que la Fundación tuviera la oportunidad de probar los daños que alegadamente Bosque Real ocasionó a su predio. De esta sentencia recurren ante nos las peticionarias Bosque Real y MAC alegando que:

1. ERRÓ EL TRIBUNAL APELATIVO AL DETERMINAR QUE PROCEDE LA CONCESIÓN DE REMEDIOS SI LA FUNDACIÓN PRUEBA DAÑOS CONTINUADOS Y AL NO DETERMINAR QUE FALTAN PARTES INDISPENSABLES.

2. ERRÓ EL TRIBUNAL APELATIVO AL DECLARAR NULOS LA AUTORIZACIÓN DE LA CONSULTA DE BOSQUE REAL Y LOS OTROS PERMISOS OTORGADOS PARA EL DESARROLLO DEL PROYECTO.

   (a) Contrario a lo determinado por el Tribunal Apelativo, el proyecto Bosque Real no tiene una densidad mayor que la del área circundante. Por ende, la Junta de Planificación no estaba obligada a celebrar una vista pública bajo la subsección 97.03 [sic] del Reglamento de Zonificación.

(b) El Tribunal Apelativo actuó contrario a principios claros de hermenéutica al concluir que la subsección 97.02(3) del Reglamento de Zonificación requiere la celebración de una vista pública cuando se dé cualquiera de las dos condiciones allí establecidas.

(c) Contrario a lo que concluyó el Tribunal Apelativo, la Junta de Planificación no tenía la obligación de celebrar vistas públicas porque el cambio autorizado de un distrito R-1 a R-3 no constituye una variación en "uso".

3. ERRÓ EL TRIBUNAL APELATIVO AL DECLARAR LA FALTA DE FINALIDAD DE LA CONSULTA DE UBICACIÓN DE BOSQUE REAL.

4. ERRÓ EL TRIBUNAL APELATIVO AL DETERMINAR QUE SE VIOLÓ LA LEY DE POLÍTICA PÚBLICA AMBIENTAL.

(a) Contrario a lo que concluyó el Tribunal Apelativo, la Junta de Planificación cumplió con su deber ministerial de evaluar adecuadamente el impacto ambiental del proyecto Bosque Real.

(b) Contrario a lo que concluyó el Tribunal Apelativo, Bosque Real no tenía la obligación de identificar el predio de la Fundación como "bosque" ni como sistema ecológico de particular interés.

5. ERRÓ EL TRIBUNAL APELATIVO AL NO DETERMINAR QUE LA CAUSA DE ACCIÓN EN DAÑOS DE LA FUNDACIÓN ESTÁ PRESCRITA.

Con este trasfondo fáctico, procederemos a resolver la presente controversia a la luz de la normativa aplicable.

II

Para analizar el primer señalamiento de error es necesario acudir a las Reglas de Procedimiento Civil y su

jurisprudencia interpretativa. Dispone la Regla 16 sobre la acumulación indispensable de partes:

Regla 16.1. Acumulación indispensable

Las personas que tuvieren un interés común sin cuya presencia no pueda adjudicarse la controversia, se harán partes y se acumularán como demandantes o demandadas según corresponda. Cuando una persona que deba unirse como demandante rehusare hacerlo, podrá unirse como demandada.

Regla 16.2. Acumulación no indispensable

El tribunal podrá ordenar la comparecencia de aquellas personas sujetas a su jurisdicción, que a pesar de no ser partes indispensables, deban ser acumuladas si se ha de conceder un remedio completo a las personas que ya sean partes en el pleito. 32 L.P.R.A. Ap. III.

Este precepto procesal forma parte del esquema de rango constitucional que prohíbe que una persona sea privada de su libertad o propiedad sin el debido proceso de ley. Art. II, Sec. 7, Const. E.L.A., L.P.R.A., Tomo 1. También obedece a la necesidad de que se incluyan en el pleito aquellas partes que sean necesarias para obtener un remedio completo. *Cepeda Torres v. García Ortiz*, 132 D.P.R. 698, 704 (1993). Mediante esta Regla se protege a las personas ausentes de un pleito de los posibles efectos perjudiciales que le pueda ocasionar un decreto judicial y, además, se evita la multiplicidad de litigios. *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407, 412-13 (1982); *Rodríguez Rodríguez v. Moreno Rodríguez*, 135 D.P.R. 623, 627 (1994).

Una parte indispensable es "aquella cuyos derechos e intereses podrían quedar destruidos o inevitablemente afectados por una sentencia dictada estando esa persona ausente del litigio". (Énfasis suplido.) *Fuentes v.*

*Tribunal de Distrito*, 73 D.P.R. 959, 981 (1952). El tercero ausente debe tener un interés común en el pleito que convierte su presencia en un requisito indispensable para impartir justicia completa. *Hernández Agosto v. López Vives*, 114 D.P.R. 601, 605 (1983). La frase "remedio completo" tiene un significado especial. Ésta no debe interpretarse conforme a criterios estrictamente semánticos. "El remedio completo a que se refiere la Regla 16 alude al remedio entre las personas y entidades *que ya son partes en el pleito* y no al obtenible entre una parte y el ausente." (Énfasis en el original.) *Id.* en la pág. 607.

Para determinar si se debe acumular una parte, es necesario evaluar los hechos particulares de cada caso. En dicho análisis deben tomarse en cuenta factores, tales como: tiempo, lugar, modo, clase de derechos, alegaciones, prueba, intereses en conflicto, formalidad y resultado. *Sánchez Encarnación v. Sánchez Brunet*, res. el 13 de julio de 2001, 154 D.P.R. _____ (2001), 2001 T.S.P.R. 107, 2001 J.T.S. 112.

Conforme la Regla 10.2 de Procedimiento Civil, 3 L.P.R.A. Ap. III, la omisión de una parte indispensable constituye una defensa para la parte contra la cual se reclama y puede dar lugar a la desestimación del pleito. Sin embargo, lo anterior no es óbice para que el tribunal ordene traer al pleito a la parte omitida. José A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, Tomo 1, Publicaciones JTS, 2000, pág. 371; *Meléndez Gutiérrez v. E.L.A.*, 113 D.P.R. 811, 816 (1983); *Vencedor Dev. Corp. v. Aut. de Carreteras*, 136 D.P.R. 456, 460 (1994). Por otro

lado, anteriormente hemos establecido que cuando el tercero ausente es el Estado o alguna de sus agencias o funcionarios, existe una tendencia a evitar dificultar la labor del demandante con planteamientos sobre partes indispensables. *Hernández Agosto v. López Vives*, *supra*, en la pág. 611.

La parte peticionaria alega que el Departamento de Recursos Naturales es parte indispensable en el caso de autos debido a que dicha agencia tiene la responsabilidad de establecer las medidas que sean necesarias para la conservación forestal. Además, es la encargada de estimular la iniciativa privada a tales fines, de acuerdo con la Ley de Bosques de Puerto Rico, Ley Núm. 33 de 1 de julio de 1975, según enmendada, 12 L.P.R.A. §§ 191 *et seq.* Arguyen los peticionarios que el foro apelativo erró al ordenarles la reparación de los daños ocasionados al sistema ecológico de la Fundación ya que sería el Departamento de Recursos Naturales el encargado de toda siembra y establecimiento de zona de amortización ambiental. No les asiste la razón.

En primer lugar, la Fundación no ha sido declarada Bosque Estatal o Bosque Auxiliar,[3] sino que fue reconocida como lugar de interés público en consideración a su valor histórico, educativo y cultural mediante la Ley Núm. 68 de 3 de julio de 1986. Debido a lo anterior, no es el

---

[3] La Ley de Bosques de Puerto Rico faculta al Gobernador(a) para declarar como Bosque Estatal cualquier terreno que crea es más apropiado para uso forestal que para otros usos. El Secretario de Recursos Naturales podrá clasificar como Bosques Auxiliares tierras privadas que excedan de cinco (5) cuerdas contiguas a aquellas dedicadas

Departamento de Recursos Naturales el principal encargado de tal predio, aunque sí se reconoce el valor ecológico de la Fundación debido a la colección arbórea existente en el predio.

En segundo lugar, no es indispensable la comparecencia del Departamento de Recursos Naturales para que este Tribunal pueda conceder un remedio completo. Conforme la jurisprudencia previamente citada, el remedio completo al que aluden las Reglas de Procedimiento Civil se refiere al obtenible entre las partes que ya están en el pleito y no entre una parte y el tercero ausente. *Hernández Agosto v. López Vives*, *supra*. El remedio solicitado en la presente causa de acción es el resarcimiento de los daños ambientales que sufrió el predio de la Fundación colindante con Bosque Real. De probarse tales daños, Bosque Real tiene plena capacidad para repararlos ya sea reemplazando los árboles cortados, creando una zona de amortización entre ambos predios o mediante cualquier otro medio que el foro de instancia estime apropiado. En tales circunstancias, no es indispensable la intervención del Departamento de Recursos Naturales ya que aunque dicha agencia es la encargada de implantar la política pública de conservación, expansión y protección forestal del Estado Libre Asociado, 12 L.P.R.A. § 192, nuestro ordenamiento no excluye la iniciativa privada en la siembra de árboles y conservación ambiental. La ausencia del Departamento de Recursos Naturales como parte en la controversia ante nos, no impide que la Fundación

---

exclusivamente a la producción y desarrollo de bosques. 12

obtenga un remedio adecuado en caso de que logre probar los daños alegados.

Por otra parte, aducen los peticionarios que los dueños de los apartamentos de Bosque Real son partes indispensables para adjudicar la presente controversia ya que son ellos los actuales dueños del predio objeto de este litigio. Respecto a este señalamiento, debemos hacer referencia a la Regla 22.3 de las de Procedimiento Civil que establece, en lo pertinente, que "[e]n caso de cualquier cesión de interés, podrá continuarse el pleito por o contra la parte original, a menos que el tribunal, previa solicitud al efecto, disponga que el cesionario sea sustituido en el pleito o acumulado a la parte original." 32 L.P.R.A. Ap. III.

Cuando ocurre la cesión de un crédito o un bien, la sustitución es optativa. "Quiere decir que no es indispensable verificar la sustitución del cesionario por el cedente como parte ya que una vez cedido un bien o crédito litigioso la R. 22.3, 1979 permite que el caso continúe tramitándose en pro o en contra del titular original, o sea del cedente." Rafael Hernández Colón, *Práctica jurídica de Puerto Rico*, Michie of Puerto Rico, 1997, pág. 120. En *Pereira v. I.B.E.C.*, 95 D.P.R. 28, 66 (1967), reiteramos esta norma al establecer que la demanda incoada en contra de una compañía desarrolladora y los compradores de las residencias, quienes llevaron a cabo ventas sucesivas, pudo haber continuado a nombre de los compradores originales a tenor con la Regla 22.3. "La realidad es que el trámite

L.P.R.A. §§ 193, 200.

procesal de sustitución en nada afecta los derechos sustantivos de las partes." *Id.* Al no ser compulsoria la sustitución de Bosque Real y MAC por los adquirentes de los apartamentos, no procede desestimar la demanda instada contra los peticionarios por falta de parte indispensable, por lo tanto, no se cometió el primer error.

III

En su segundo señalamiento de error los peticionarios alegan que incidió el tribunal apelativo al declarar la nulidad de la consulta de ubicación y de los permisos otorgados para el desarrollo del proyecto Bosque Real por haber incumplido los requisitos de notificación a los colindantes y de celebración de vista pública.

La Junta de Planificación es el organismo gubernamental creado con el propósito de desarrollar los recursos humanos, económicos, ambientales y físicos de forma coordinada para crear las condiciones necesarias que propendan al desarrollo integral de la sociedad. 23 L.P.R.A. § 62c. Su creación obedece a la necesidad de velar por la ordenada y adecuada utilización de nuestros escasos terrenos y recursos naturales. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A. Tomo 1. La Junta debe ejercer sus funciones cumpliendo con la política pública del Estado Libre Asociado de "fomentar la participación de la ciudadanía en el proceso de planificación de Puerto Rico". 23 L.P.R.A. § 62v(a). Entre los deberes de dicho cuerpo se encuentra el de promover la

comprensión pública del proceso de planificación, empleando aquellos medios informativos que estime adecuados. 23 L.P.R.A. § 62v(b).

Al amparo de las facultadas delegadas en ley, la Junta aprobó el Reglamento de Zonificación de 1992.[4] En la sección introductoria, el Reglamento establece:

> Mediante la zonificación se establecen las normas esenciales sobre cómo y dónde deben ubicarse las múltiples actividades sociales y económicas de Puerto Rico. A través de este proceso se clasifican los terrenos en zonas o distritos y se establecen para cada uno disposiciones específicas sobre el uso de los terrenos y sobre las obras y estructuras a permitirse. Reglamento de Zonificación de Puerto Rico, Reglamento de Planificación Núm. 4 de 16 de septiembre de 1992, 23 R.P.R. § 650.1640.

Para evadir la rigidez del esquema de zonificación, el Reglamento establece el procedimiento de la consulta de ubicación. El mismo constituye una solicitud para que la Junta "evalúe, pase juicio y tome la determinación que estime pertinente sobre propuestos usos de terrenos que no son permitidos ministerialmente por la reglamentación aplicable en áreas zonificadas pero que las disposiciones reglamentarias proveen para que se consideren". Reglamento, *supra,* en la § 2.01, 23 R.P.R. § 650.1648(59). La Junta tiene gran discreción en el ejercicio de su facultad de evaluar las consultas de ubicación, sin embargo, está sujeta al cumplimiento de las normas y requisitos establecidos en la ley y en la jurisprudencia. *T-JAC, Inc. v. Caguas*

---

[4] Dicho Reglamento fue enmendado el 5 de noviembre de 2000 mediante el Reglamento de Planificación Núm. 6211, sin embargo, para resolver la controversia de autos haremos referencia a la versión de 1992 por ser la vigente al momento de los hechos.

*Centrum Limited Partnership*, res. el 12 de abril de 1999, 148 D.P.R. _____ (1999), 99 T.S.P.R. 54, 99 J.T.S. 60.

Cuando una consulta de ubicación conlleva la variación de las disposiciones reglamentarias, se requiere la presentación de una solicitud de variación. *Id.* Las variaciones que pueden solicitarse a la luz del Reglamento son de dos (2) tipos: una variación en uso y "otras variaciones". Reglamento, *supra,* en las §§ 98.05–98.06, 23 R.P.R. § 650.1745(4)(5). La variación en uso:

> es un permiso para dedicar una propiedad a un uso prohibido por las restricciones impuestas por el Reglamento de [Zonificación] en una zona o distrito y que sólo se concede, vía excepción, para evitar perjuicios a una propiedad cuando se demuestre que, debido a circunstancias extraordinarias, la aplicación estricta de esa reglamentación equivaldría a una confiscación de la propiedad. (Énfasis en el original.) *T–JAC, Inc. v. Caguas Centrum Limited Partnership*, *supra*.

Para que la Junta pueda autorizar una variación en uso es necesario que el propietario del predio demuestre que ninguno de los usos que están permitidos en el distrito es viable en la propiedad desde el punto de vista económico o físico, es decir, debe "probar que su propiedad está particularmente afectada por una reglamentación que result[a] innecesariamente gravosa." *A.R.P.E. V. J.A.C.L.,* 124 D.P.R. 858, 864 (1989); Reglamento, *supra,* en la § 98.05, 23 R.P.R. § 650.1745(4). Además, es necesario que las razones por las cuales se solicita la variación sean únicas a la estructura y no una característica generalizada del distrito donde ubica la misma. Un requisito adicional para la concesión de una variación en uso es la celebración

de vistas públicas. Reglamento, *supra,* en la § 98.04, 23 R.P.R. § 650.1745(3).

El Reglamento de Zonificación también faculta a la Junta para autorizar "otras variaciones" a los usos permitidos en el distrito. Reglamento, *supra* § 98.06, 23 R.P.R. § 650.1745(5). Previamente hemos establecido que:

> En estos casos la variación no va dirigida a alterar el uso, sino a dispensar al propietario del cumplimiento de uno o más de los requisitos que establece el Reglamento de Zonificación, para la zona donde radica el inmueble... Una persona que solicita una variación según este apartado, al contrario de aquel que invoca la variación en uso, desea seguir utilizando la propiedad para el uso permitido, pero necesita que se le exima de uno de los requisitos de zonificación para asegurar la viabilidad del uso permitido. *Asoc. Res. Park Side, Inc. v. J.P. I*, 139 D.P.R. 349, 356 (1995).

Cuando se solicitan "otras variaciones", la celebración de vista pública tiene carácter discrecional. Reglamento, *supra,* en la § 98.06, 23 R.P.R. § 650.1745(5).

Por la naturaleza del interés público en la planificación urbana, las variaciones no se favorecen. Éstas deben concederse cuando concurran circunstancias extraordinarias y para evitar perjuicios a la propiedad. "La Junta nunca debe aplicar con laxitud los requisitos para aprobar las variaciones porque ello socava la política pública de desarrollo ordenado latente en la legislación sobre planificación." **(Énfasis suplido.)** *Asoc. Res. Park Side v. J.P. III*, res. el 7 de octubre de 1999, 149 D.P.R. _____ (1999), 99 T.S.P.R. 149, 99 J.T.S. 155.

En el caso ante nos el Tribunal de Circuito resolvió que Bosque Real había solicitado una variación en uso para el

desarrollo del proyecto y, por lo tanto, la celebración de la vista pública era de carácter mandatorio. Diferimos de la conclusión del tribunal apelativo. El complejo multifamiliar Bosque Real pretendía ser ubicado en un distrito zonificado R-1,[5] lo que significa que es de baja densidad poblacional. Reglamento, *supra,* en la § 11.00, 23 R.P.R. §650.1657. Sin embargo, como Bosque Real conllevaba la construcción de 240 apartamentos, que luego de la enmienda a la consulta de ubicación pasaron a ser 180, los peticionarios solicitaron una variación a las disposiciones reglamentarias aplicables a la propiedad ya que el complejo residencial era de alta densidad poblacional, por tanto, en la consulta solicitaron autorización para un desarrollo extenso. El uso que se le daría al predio continuaría siendo residencial, pero con una mayor densidad poblacional que en el resto del distrito. Aunque reiteramos que la redacción de la terminología del Reglamento de Zonificación es imprecisa, *Asoc. Res. Park Side v. J.P. I*, *supra*, en la pág. 354, no podemos considerar como variación en uso la solicitada por los peticionarios.

Conforme a las diferencias entre una variación en uso y "otras variaciones", que hemos expuesto previamente, la variación en uso implica autorización para utilizar la propiedad para un uso prohibido en el distrito. El uso que

_____

[5]    El Reglamento define distrito R-1 como uno "de baja densidad poblacional [que] se establece para clasificar terrenos para facilitar, según se justifique, las necesidades del crecimiento urbano, y para preservar el carácter residencial de áreas desarrolladas o que puedan desarrollarse en solares de novecientos (900) metros

pretende darle Bosque Real a su predio no está prohibido en el distrito, pues el mismo está clasificado para uso residencial. Resolver que cualquier cambio que afecte la densidad poblacional en un terreno automáticamente constituye una variación en uso, convertiría prácticamente todas las variaciones solicitadas en nuestro país en variaciones en uso, lo que conllevaría requisitos procesales adicionales que transformarían los procedimientos expeditos celebrados ante la Junta en largas jornadas con un efecto paralizante en el desarrollo urbano. Debemos recordar que los procedimientos administrativos tienen el propósito de asegurar soluciones equitativas en una forma rápida, justa y económica. Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 agosto de 1988, según enmendada, 3 L.P.R.A. § 2101.

En el caso *Asoc. Res. Park Side v. J.P. I*, *supra*, tuvimos que interpretar las escuetas definiciones que establece el Reglamento de Zonificación para determinar si la Junta estaba obligada a celebrar vistas públicas ante una solicitud por parte de la Compañía Telefónica de Puerto Rico para que se le eximiera de los requisitos reglamentarios aplicables a unos terrenos. La Compañía Telefónica pretendía construir un edificio de cuatro (4) niveles con facilidades recreativas, enfermería y estacionamiento en dos (2) solares. Uno de los solares estaba destinado a uso residencial, zonificado R-3, mientras que el otro estaba limitado a ciertas actividades comerciales, zonificado C-2.

_____

cuadrados o más". Reglamento, *supra,* en la § 11.01, 23

Luego de distinguir las figuras de variación en uso y otras variaciones, resolvimos que la solicitud de la Compañía Telefónica "al menos respecto al lote R-3, debió haber sido considerada como una variación en uso". *Asoc. Res. Park Side v. J.P. I*, *supra*, en la pág. 357. Esta determinación obedeció a que evidentemente el uso comercial propuesto por la Telefónica estaba prohibido en un distrito clasificado para uso residencial.

Bosque Real no pretende darle un uso distinto a su terreno, sino que mediante la consulta de ubicación solicitó que se le eximiera de cumplir con el requisito de densidad poblacional establecido para los distritos R-1, por lo cual, tal solicitud recae dentro de las "otras variaciones" contempladas por el Reglamento de Zonificación. De acuerdo con tales circunstancias, la celebración de una vista pública era discrecional de la Junta, por lo tanto, erró el foro intermedio al resolver que estamos ante una solicitud de variación en uso. Sin embargo, los anteriores pronunciamientos no disponen de la presente controversia.

El complejo residencial Bosque Real conllevaba una densidad poblacional mayor a la admitida en un distrito R-1. Por tal razón, A.R.P.E. desde sus consideraciones preliminares evaluó el proyecto de acuerdo a los parámetros de un distrito R-3[6] y al aprobar la consulta de ubicación

_____

R.P.R. § 650.1657(1).

[6] *Véase* Memorial de la Administración de Reglamentos y Permisos, 17 de marzo de 1995. Un distrito zonificado R-3 es de densidad poblacional intermedia y "se establece para clasificar áreas residenciales desarrolladas o que puedan desarrollarse y en donde se permitirán diferentes tipos de viviendas en solares de trescientos (300) metros cuadrados

hizo hincapié en que: "[e]l diseño y uso del proyecto cumplirá con los parámetros correspondiente [sic] a un Distrito R-3, conforme a las disposiciones del Reglamento de Zonificación".[7] De la consulta de ubicación presentada por Bosque Real y de los pronunciamientos emitidos por A.R.P.E. surge que la construcción del complejo residencial conllevaba la rezonificación de la propiedad.

En *López Malavé v. Roig Sucesores, Inc.*, res. el 17 de junio de 2002, 157 D.P.R. _____ (2002), 2002 T.S.P.R. 79, 2002 J.T.S. 85, al referirnos a consultas de ubicación que conllevan cambios en la zonificación del predio, establecimos:

> Todo proyecto que conlleve un cambio de zonificación tiene que cumplir con los requisitos *aplicables* para una rezonificación. Así, están sujetos a cumplir con las normas sobre cambios de zonificación tanto los cambios de zonificación "directos"(aquellos en los que una parte propiamente solicita un cambio de zonificación para un predio de su pertenencia) como los "indirectos" (aquellos en que mediante el vehículo procesal de la consulta de ubicación una parte pretende la aprobación de un proyecto que eventualmente conllevara [sic] la rezonificación del predio)....
>
> [E]l mero hecho de utilizar un mecanismo de consulta de ubicación no exime a una parte de cumplir con los requisitos de un cambio de zonificación (o una variación o excepción según sea el caso) si dicha consulta conlleva eventualmente una rezonificación del área.[8] (Énfasis en el original.)

---

o más". Reglamento, *supra,* en la § 13.01, 23 R.P.R. § 650.1659(1).

[7] *Véase* Memorial de la Administración de Reglamentos y Permisos, 4 de enero de 1995, pág. 6.
[8] Con estos señalamientos interpretamos y confirmamos nuestra decisión de *T-JAC, Inc. v. Caguas Centrum Limited Partnership*, *supra*.

El Reglamento de Zonificación establece que la Junta **podrá considerar el rezonificar algún sector o solar, siempre que la parte peticionaria:** notifique su intención de radicar la solicitud de cambio de zonificación a los dueños de las propiedades más cercanas al área cuya rezonificación se propone; **incluya un plano de localización; prepare un memorial explicativo con una descripción completa del sector, explique las razones para su solicitud y los beneficios que derivará la comunidad con el cambio; e incluya la cabida del solar en metros cuadrados. Reglamento,** *supra,* **en la § 4.06, 23 R.P.R. § 650.1650(6). Además, el Reglamento establece que** "se requerirá la celebración de una vista pública previa a cualquier determinación de la Junta sobre la propuesta de zonificación o rezonificación." **(Énfasis suplido.) Reglamento,** *supra,* **en la § 4.08, 23 R.P.R. § 650.1650(8).**

**Los peticionarios presentaron una consulta de ubicación que implicaba la rezonificación de un predio de R-1 a R-3, por lo cual tenían que cumplir con los requisitos reglamentarios para una rezonificación, que incluyen la notificación a los colindantes. Por su parte, la Junta estaba obligada a celebrar una vista pública. Al examinar el expediente de autos hallamos que la Fundación, predio colindante con Bosque Real, no fue notificada de ninguno de los incidentes procesales referentes a la consulta de ubicación. Tampoco se celebró la vista pública requerida en situaciones como la presente. El incumplimiento con los requisitos reglamentarios para una consulta de ubicación que**

conllevaba la rezonificación del predio vicia de nulidad dicha consulta y los permisos otorgados para el proyecto. Ni la Junta ni los peticionarios pueden evadir el cumplimiento con las disposiciones legales utilizando subterfugios nominales en contravención con la clara política pública que requiere la participación ciudadana en la planificación del país.

Aunque lo anterior dispone del segundo error aducido por la parte peticionaria, conviene señalar que Bosque Real en su consulta de ubicación solicitó que su proyecto se denominara como desarrollo residencial extenso. Tal solicitud, aunada a la rezonificación que implicaba la construcción, obligaba a los peticionarios a cumplir con los requisitos de rezonificación y de desarrollo extenso. Un desarrollo extenso:

> Comprende los desarrollos residenciales para veinte (20) o más familias o solares en pueblos o áreas con una población urbana censal menor de diez mil (10,000) personas; treinta (30) o más familias o solares en pueblos o áreas con una población urbana censal entre diez mil (10,000) a cuarenta mil (40,000) personas y cuarenta (40) o más familias o solares en pueblos o áreas con una población urbana censal sobre cuarenta mil (40,000) personas conforme a los resultados del último censo poblacional.... Reglamento, *supra,* en la § 2.01, 23 R.P.R. § 650.1648(68).

Al evaluar un proyecto de desarrollo residencial extenso, la Junta debe tomar en consideración los siguientes factores: conformidad del uso propuesto y su intensidad con el Plan de Usos de Terrenos; disponibilidad, programación y mejoras propuestas por el proyecto a la infraestructura del sector; y la forma en que el proyecto propiciaría el desarrollo integral del sector y mantendría las mejoras

existentes. Reglamento, *supra,* en la § 95.03, 23 R.P.R. § 650.1742(2). Constituye un requisito esencial que:

> Se celebr[e] vista pública con notificación a los dueños de los terrenos circundantes cuando el desarrollo residencial extenso tenga acceso a una calle municipal a la cual den frente más de diez (10) estructuras residenciales en una distancia de doscientos cincuenta (250) metros, medidos desde las entradas al proyecto, y siempre que la densidad propuesta sea mayor que la del área circundante. Reglamento, *supra,* en la § 97.02, 23 R.P.R. § 650.1744(1)(c).

Los peticionarios alegan que la recién citada disposición establece el requisito de vista pública cuando concurran las dos (2) condiciones allí establecidas. Tal conclusión es errónea a la luz de nuestra decisión en *Ortiz v. J.P.,* res. el 26 de septiembre de 2000, 152 D.P.R. _____ (2000), 2000 T.S.P.R. 139, 2000 J.T.S. 151:

> [Este inciso] del Reglamento de Zonificación, en relación a proyectos de desarrollo residencial **extenso,** establece dos (2) circunstancias en las cuales es mandatorio que la Junta celebre vistas públicas con notificación a los dueños de terrenos circundantes. La primera es cuando el proyecto tenga acceso a una calle municipal bajo las condiciones allí descritas. Y, la segunda, que es de aplicación al caso de autos, siempre que la densidad propuesta sea mayor que la del área circundante. **Esta interpretación no sólo le insufla vida a la política pública de "*fomentar la participación de la ciudadanía en el proceso de planificación*" esbozada por la propia Ley Orgánica de la Junta de Planificación de Puerto Rico, sino que establece un balance entre el poder del estado para velar por la adecuada utilización de los terrenos y el derecho de los ciudadanos al libre disfrute de sus propiedades. Además fomenta la confianza del Pueblo en que las zonificaciones donde tienen sus hogares no serán alteradas a sus espaldas y sin brindarles la oportunidad de que los funcionarios públicos a cargo del proceso tomen en consideración sus puntos de vista. (Énfasis suplido y citas omitidas.)**

El Tribunal de Circuito interpretó correctamente la mencionada disposición ya que será necesaria la celebración de una vista pública en los casos de desarrollos residenciales extensos cuando concurran cualquiera de las dos (2) circunstancias establecidas en el Reglamento. En el caso de marras, Bosque Real tiene una densidad de un distrito R-3 a pesar que está ubicado en un distrito R-1, por lo cual era necesaria la celebración de vista pública. Al incumplirse tal requisito, la consulta de ubicación mediante la cual fue aprobado el proyecto es nula. El segundo error no fue cometido.

Por las razones expuestas anteriormente para declarar la nulidad de la consulta de ubicación de Bosque Real, es innecesario abordar el cuarto señalamiento de error a los efectos de que la Junta evaluó adecuadamente el impacto ambiental del proyecto. Procederemos a determinar si la decisión de la Junta era final a la luz de las doctrinas de cosa juzgada y agotamiento de remedios administrativos.

IV

La doctrina de cosa juzgada, de origen romano, tiene base estatutaria en el artículo 1204 del Código Civil de Puerto Rico, 31 L.P.R.A. § 3343. De acuerdo con éste, para que se active la presunción de cosa juzgada en otro juicio, "es necesario que entre el caso resuelto por la sentencia y aquél en que ésta sea invocada, concurra la más perfecta identidad entre las cosas, las causas, las personas de los

litigantes y la calidad con que lo fueron." *Id.* La doctrina está fundamentada en el interés del Estado en ponerle fin a los litigios y en proteger a los ciudadanos para que no se les someta en múltiples ocasiones a los rigores de un proceso judicial. *Pérez v. Bauzá*, 83 D.P.R. 220, 225 (1961). El efecto de la aplicación de esta doctrina es que la sentencia emitida en un pleito anterior impide que se litiguen posteriormente, entre las mismas partes y sobre las mismas causas de acción y cosas, las controversias ya litigadas y adjudicadas y aquellas que se pudieron haber litigado. *Pagán Hernández v. U.P.R.*, 107 D.P.R. 720, 732-33 (1978); *Mercado Riera v. Mercado Riera*, 100 D.P.R. 940, 950 (1972).

En el campo del derecho administrativo, la doctrina de cosa juzgada es aplicable en las siguientes vertientes: dentro de la misma agencia; interagencialmente, es decir, de una agencia a otra; y entre las agencias y los tribunales. *Pagán Hernández v. U.P.R.*, *supra,* en la pág. 733. A pesar de lo anterior, la aplicabilidad de la doctrina a los procesos administrativos no es automática y absoluta. "Judicialmente existe el poder de modificar y hasta de rechazar las determinaciones administrativas cuando ese curso sea el más justo y conveniente en orden al interés público. Igualmente existe la facultad de evaluar si las partes han podido litigar oportuna y adecuadamente la controversia presentada en el foro administrativo." *Acevedo v. Western Digital Caribe, Inc.*, 140 D.P.R. 452, 454 (1996). Al considerar las excepciones para aplicar la doctrina de

cosa juzgada en el contexto administrativo hemos expresado que:

> [S]i la aplicación rigurosa de la [doctrina] derrotaría en la práctica un derecho permeado en alguna forma del interés público, los tribunales se inclinan hacia la solución que garantice cumplida justicia, en lugar de favorecer en forma rígida una ficción de ley que obedece fundamentalmente a un principio de conveniencia y orden procesal. En otras palabras, la regla no es absoluta y debe siempre considerarse conjuntamente con el saludable principio de que debe dispensarse justicia en cada caso. (Citas omitidas.) *Pérez v. Bauzá, supra,* en la pág. 226; *Millán v. Caribe Motors Corp.,* 83 D.P.R. 494, 505, 510 (1961); *Pagán Hernández v. U.P.R., supra,* en las págs. 735-37; *Banco de la Vivienda v. Carlo Ortiz,* 130 D.P.R. 730, 739 (1992).

En primer lugar, entre el presente caso y el procedimiento administrativo no existe la perfecta identidad de partes requerida para la aplicación de la doctrina de cosa juzgada. La Fundación no fue parte de los incidentes procesales que culminaron en la aprobación de la consulta de ubicación presentada por Bosque Real. Aunque la Fundación es el predio colindante con el proyecto, nunca fue notificada de los procedimientos llevados a cabo ante la Junta para aprobar la construcción propuesta. Precisamente en la falta de notificación de la consulta de ubicación es que se basó la Fundación para solicitar la nulidad de ésta. ¿Cómo vamos a privar a la parte demandante de su derecho a impugnar una consulta de ubicación aprobada en contravención a las leyes y reglamentos alegando que fue parte de un proceso previo del que ni siquiera fue notificada?

En segundo lugar, la controversia que nos atañe está indiscutiblemente revestida de interés público, circunstancia que opera como excepción a la aplicación de la

doctrina de cosa juzgada. Constitucionalmente se estableció como política pública del Estado Libre Asociado de Puerto Rico la conservación eficaz de los recursos naturales y lograr el mayor aprovechamiento de los mismos para el beneficio de la ciudadanía en general. Art. VI, Sec. 19, Const. E.L.A., L.P.R.A., Tomo 1. La Junta de Planificación es la agencia encargada de implantar dicha política pública mediante proyectos de desarrollo que armonicen los intereses de modernizar el país y de conservar un balance adecuado entre los recursos naturales. Hoy los fines de la justicia y el interés de proteger el medio ambiente y la pureza en los procesos de planificación urbana nos urgen a adjudicar una controversia sobre la validez de una consulta de ubicación que a todas luces fue aprobada mediante un procedimiento viciado y carente del indispensable requisito de la participación de los principales afectados con la construcción. Bajo estas circunstancias, no es aplicable la doctrina de cosa juzgada.

Los peticionarios también han alegado que la Fundación está impedida de acudir al foro judicial por falta de agotamiento de remedios administrativos al no solicitar revisión judicial de la determinación de la agencia. La doctrina de agotamiento de remedios administrativos tiene el efecto de posponer la etapa en la cual el litigante puede acudir al foro judicial hasta tanto finalice el trámite administrativo. Este postulado permite a las agencias aplicar su peritaje y ejercer su discreción en controversias particulares cuya solución les ha sido delegada. *Rivera v.*

*E.L.A.*, 121 D.P.R. 582, 595 (1988).[9] La Ley de Procedimiento Administrativo Uniforme, Ley Núm. 170 de 12 de agosto de 1988, 3 L.P.R.A. § 2173, establece que se podrá exceptuar del agotamiento de remedios administrativos cuando: el remedio administrativo sea inadecuado; el requerir agotamiento de remedios pueda ocasionar un daño irreparable al promovente y el balance de intereses no justifica agotar dichos remedios; se alegue una violación sustancial a derechos constitucionales; sea inútil agotar remedios administrativos por ser éstos de dilación excesiva; haya falta de jurisdicción de la agencia; o cuando se trate de un asunto puramente de derecho donde la pericia administrativa sea innecesaria.

De acuerdo con los peticionarios, la Fundación estaba obligada a agotar remedios administrativos solicitando revisión judicial de la determinación de la Junta. Nuevamente debemos destacar la importancia de la falta de notificación a los demandantes. El incumplimiento con este requisito impidió a la Fundación solicitar la revisión de la aprobación de la consulta y de los permisos otorgados para el proyecto. En *Ortiz v. J.P.*, *supra*, resolvimos que el término jurisdiccional para solicitar la reconsideración de la decisión administrativa, es inaplicable cuando se trata de una solicitud de reconsideración presentada por quien no

---

[9] Véase en general sobre la doctrina de agotamiento de remedios administrativos, K.C. Davis, *Administrative Law Treatise*, 2da ed., K.C. Davis Pub. Co., 1983, Vol. 4, Cap. 26, Sec. 26:1, págs. 414-415; Demetrio Fernández Quiñones, *Derecho administrativo y Ley de Procedimiento Administrativo Uniforme*, 2da ed., FORUM, 2001, Sec. 8.7, págs. 459-75.

es parte en el procedimiento administrativo. **Igual solución se impone en el caso de autos ya que la Fundación no fue notificada de la determinación de la Junta ni de su derecho a solicitar revisión judicial por no ser parte en el procedimiento. Los demandantes no pueden sufrir las consecuencias del incumplimiento con las disposiciones legales efectuado por la Junta y los peticionarios. La Fundación podía acudir, como lo hizo, al foro judicial para solicitar la nulidad de la consulta de ubicación y de los permisos.**

**No obstante haber declarado la nulidad de la consulta de ubicación y de los permisos otorgados, una vez más nos enfrentamos a un proyecto de construcción ya finalizado y que se ha convertido en la vivienda de ciento ochenta (180) familias, por ende, no podemos ordenar su paralización o demolición. La Fundación, ante esta circunstancia, ha solicitado la reparación de los daños continuos que ha sufrido su predio como consecuencia de la construcción, pero los peticionarios alegan que la causa de acción está prescrita. Es con este trasfondo que pasamos a examinar el quinto error, relacionado con la figura de la prescripción extintiva.**

V

**El artículo 1802 del Código Civil establece el principio de la responsabilidad civil extracontractual. Así, dispone: "[e]l que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado".** 31 L.P.R.A. § 5141. **Este precepto está**

inspirado en el deber general de todas las personas de actuar con la debida circunspección. Para que prospere una causa de acción bajo este artículo es necesario que concurran tres (3) requisitos: un acto u omisión culposo o negligente; que cause daño; y que exista una relación causal entre el acto u omisión y el daño sufrido. *Soc. de Ganaciales v. González Padín*, 117 D.P.R. 94, 105-06 (1994); *Hernández v. Fournier*, 80 D.P.R. 93, 96 (1957).

El término prescriptivo para ejercitar una causa de acción en daños y perjuicios al amparo del artículo 1802 es de un (1) año contado a partir del momento en que el perjudicado tuvo conocimiento del daño y de la identidad de quien lo causó. Art. 1868 del Código Civil, 31 L.P.R.A. § 5298; *Marrero Cancel v. Caribbean Hosp. Corp.*, res. el 11 de marzo de 2002, 156 D.P.R. _____ (2002), 2002 J.T.S. 35, 2002 T.S.P.R. 29. La prescripción extintiva se basa en el imperativo de castigar la inercia en el ejercicio de los derechos. *De Jesús v. Chardón*, 116 D.P.R. 238, 242-43 (1985). "La prescripción de las acciones se interrumpe por su ejercicio ante los tribunales, por reclamación extrajudicial del acreedor y por cualquier acto de reconocimiento de la deuda por el deudor". Art. 1873 del Código Civil, 31 L.P.R.A. § 5303.

¿Interrumpió la Fundación el término prescriptivo para ejercitar su causa de acción en daños y perjuicios mediante su demanda de intervención? Nuestra respuesta es en la afirmativa. Según surge de la estipulación de hechos, el 11 de mayo de 1996 Bosque Real comenzó la limpieza y nivelación

del terreno, actividades que implicaron cortar parte de la colección arbórea de la Fundación. El 18 de septiembre, el Municipio radicó una demanda y una moción de interdicto preliminar y permanente contra los peticionarios. Fue el 23 de septiembre del mismo año cuando la Fundación radicó su demanda de intervención dentro del procedimiento iniciado por el Municipio. En su demanda, la Fundación enumeró los árboles que Bosque Real había derribado para comenzar su construcción y alegó los daños que su predio había sufrido como consecuencia de los trabajos en el proyecto. Además, suplicó al tribunal que dictara los remedios procedentes para proteger el balance ecológico del predio donde ubica la Fundación. A todas luces la demanda fue radicada dentro de un (1) año desde que los peticionarios cortaron los árboles, es decir, desde el 11 de mayo de 1996. Los peticionarios no tienen razón al alegar que tal demanda de intervención no interrumpió el término prescriptivo ya que la Fundación solicitó que el tribunal concediera los remedios apropiados a la luz de los hechos del caso. El Tribunal de Circuito, al igual que hoy lo hace este Foro, estimó que el remedio procedente es la concesión de daños luego de que la Fundación pruebe los mismos.

En virtud de todo lo anterior, se modifica la sentencia del Tribunal de Circuito de Apelaciones a los efectos establecer que la consulta de ubicación no era una variación en uso y así modificada se confirma. Se devuelve el caso para que continúen los procedimientos de forma compatible con lo aquí resuelto.

**MIRIAM NAVEIRA DE RODÓN**
Jueza Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Municipio de San Juan

    Demandante

       v.

Bosque Real S.E.; MAC Development          CC-2000-361
Corp.; Junta de Planificación;
Junta de Calidad Ambiental

    **Demandadas – Apeladas todas**
    **Peticionarias las dos primeras**

**Fundación Luis Muñoz Marín**

    **Interventora – Apelante**
    **Recurrida**


**SENTENCIA**


**San Juan, Puerto Rico a 4 de marzo de 2003**


    **Por los fundamentos expuestos en la Opinión que antecede, se modifica la sentencia del Tribunal de Circuito de Apelaciones a los efectos de establecer que la consulta de ubicación no era una variación en uso y así modificada se confirma. Se devuelve el caso para que continúen los procedimientos de forma compatible con lo aquí resuelto.**

    **Lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez no intervino. El Juez Presidente señor Andréu García y el Juez Asociado señor Hernández Denton están inhibidos.**


               **Patricia Otón Olivieri**
           **Secretaria del Tribunal Supremo**